UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. 14 CR 10067 |
| ) | |
| v. ) | VIOLATIONS: |
| ) | |
| FATHALLA MASHALI ) | 18 U.S.C. § 1347 (health care fraud) |
| ) | 18 U.S.C. § 2 (aiding and abetting) |

## INDICTMENT

The Grand Jury charges that:

### General Allegations

At all times pertinent to this Indictment:

### The Medicare Program

1. The Medicare program was a federally subsidized health insurance program for the elderly and for persons with certain disabilities pursuant to title XVIII of the Social Security Act. The program was administered by the Health Care Financing Administration of the United States Department of Health and Human Services, which, on July 1, 2001, became the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services (collectively referred to in this Indictment as "CMS").

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), in that it was a public plan affecting commerce, under which medical benefits, items, and services were provided to individuals, and included individuals and entities who were providing medical benefits, items, and services for which payment could be made

1

under the plan. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

3. Medicare in the Commonwealth of Massachusetts and the state of Rhode Island was administered by the National Heritage Insurance Company ("NHIC"), a company that contracted with CMS to receive, adjudicate, and pay certain Medicare claims.

4. Once certified to practice, a health care provider obtained a National Provider Identifier ("NPI") number. The NPI number was a unique ten-digit identification number much like a social security number. With the NPI number, the health care provider enrolled with CMS to become eligible to bill Medicare for services rendered to Medicare beneficiaries. As part of the enrollment process, Medicare issued the health care provider a Provider Identification Number ("PIN"). All health care providers had to certify that they would only bill the government for services that they actually rendered.

5. In order to receive Medicare funds, enrolled Medicare health care providers, together with their authorized agents, employees, and contractors, were required to abide by the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care providers were given and provided with online access to Medicare manuals and services bulletins describing proper billing procedures, rules, and regulations.

6. In order to receive payment for services, health care providers had to submit a Medicare claim form to CMS through a local carrier, such as the NHIC. The local carrier, in turn, received, processed, and authorized payment to health care providers for services covered under the Medicare program according to the established rules, regulations, and procedures. A

Medicare claim was required to set forth, among other things, the beneficiary's name, the date the services were provided, the cost of the services, and the name and NPI of the physician or physician assistant who performed the services for the patient. Health care providers were not required to send the local carrier copies of medical records or other forms to justify the Medicare claim. The claim generally was all that was required to receive payment from Medicare. The claim forms could be submitted to the local carrier either electronically or through the mail.

7. The American Medical Association published a manual entitled Current Procedural Terminology Codes (the "CPT Code"), which contained the universally recognized billing codes used by health care providers. This manual contained a list of CPT codes, a description of the corresponding services, and an explanation for billing the codes.

8. When bills were submitted to CMS for payment under the Medicare program, health care providers or persons billing on their behalf were expected to identify the proper CPT code that corresponded to the service provided, as well as any appropriate modifiers to designate the personnel who performed the visit.

9. With respect to office visits of an established patient, a health care provider could submit a bill using one of five "evaluation and management" CPT codes: 99211, 99212, 99213, 99214, or 99215. Determination of the proper CPT code depended on the nature of the office visit. Specifically, the CPT Code described codes 99211 through 99214 as follows:

    a. 99211: Office or other outpatient visit for the evaluation and management of an established patient that may not require the presence of a physician. Usually, the presenting problem(s) are minimal. Typically, 5 minutes are spent performing or supervising these services.

    b. 99212: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 components: (1) a problem-focused history; (2) a problem-focused examination; (3) straightforward

  medical decision-making. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are self-limited or minor. Physicians typically spend 10 minutes face-to-face with the patient and/or family.

  c. 99213: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components: (1) an expanded problem-focused history; (2) an expanded problem-focused examination; (3) medical decision-making of low complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of low to moderate severity. Physicians typically spend 15 minutes face-to-face with the patient and/or family.

  d. 99214: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components: (1) a detailed history; (2) a detailed examination; (3) medical decision-making of moderate complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate to high severity. Physicians typically spend 25 minutes face-to-face with the patient and/or family.

10. While Medicare claim processors could reject a claim if, for example, the health care provider or beneficiary was not enrolled, claim processors generally did not contact the beneficiary or health care provider before payment was made to confirm that the billed services were actually provided. They also did not typically review medical records or other underlying documentation to substantiate the billed services. Instead, Medicare presumed the truth of each claim, and generally paid health care providers for the services that they billed. In other words, Medicare entrusted their enrolled providers to only submit claims for the services that they actually performed.

11. Although Medicare did not generally scrutinize claims before payment, the program retained the right to audit health care providers after payment was made. As a result,

4

health care providers were obligated to retain original source records, such as medical records, charts, and other documents, that tended to show the nature of the services actually rendered by the health care provider. In the event that Medicare agents, such as the NHIC, discovered that a claim was not supported by the underlying documentation, the Medicare program could recoup those funds from the health care provider, or impose sanctions.

### The Defendant FATHALLA MASHALI

12. FATHALLA MASHALI ("MASHALI") was a resident of Dover, MA, and a licensed physician who held two licenses issued by the U.S. Drug Enforcement Administration ("DEA") to prescribe controlled substances – DEA #BM4286375 (Massachusetts) and DEA #BM4415370 (Rhode Island). On September 11, 2013, MASHALI voluntarily surrendered both registrations.

13. MASHALI was the owner of New England Wellness & Pain Management, P.C., a/k/a New England Pain Associates, P.C., of Massachusetts and Rhode Island, a/k/a Greystone Pain Management, Inc., a/k/a New England Pain Institute, P.C. (hereinafter collectively referred to as "NEPA"), which operated three pain management clinics in Massachusetts and one in Rhode Island. NEPA pain clinics operated at the following locations in Massachusetts: (1) 169 North Franklin Street, Holbrook, MA, 02343; (2) 10 Converse Place, 4th Floor, Winchester, MA, 01890; and (3) 48 Elm Street, Worcester, MA, 02609. NEPA's Rhode Island pain clinic was located at 6 Blackstone Valley Place, Lincoln, RI, 02865.

14. MASHALI had previously operated a pain clinic in Weymouth, MA. In or about the late spring or early summer of 2011, he transferred his Weymouth practice (including all employees, equipment, and patients) to the location in Holbrook, MA. MASHALI also had

5

previously operated a pain clinic in Woonsocket, RI. In or about February 2013, he transferred his Woonsocket practice (including all employees, equipment, and patients) to the location in Lincoln, RI.

15.  NEPA was a Massachusetts professional corporation, incorporated in April 2005. The Massachusetts Secretary of State identified MASHALI as NEPA's Resident Agent, President, Treasurer, Secretary, and Director. NEPA was also a registered professional corporation in Rhode Island until its corporate status was revoked on October 20, 2008, due to a failure to pay appropriate licensure fees.

16.  Among NEPA's patients were Medicare beneficiaries, for whom NEPA submitted claims for reimbursement to Medicare through the NHIC.

### The Scheme To Defraud

17.  From on or about October 13, 2010 and continuing until on or about March 2, 2013, defendant FATHALLA MASHALI, with others known and unknown to the Grand Jury, devised a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United State Code, Section 24(b), that is, Medicare, and to obtain by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, by causing the submission to Medicare of materially false and fraudulent claims for services that were not in fact provided to those Medicare beneficiaries.

### The Purpose of the Scheme and Artifice

18. It was the purpose of the scheme for MASHALI to unlawfully enrich himself and others and to defraud the Medicare program of money by causing the submission of materially false and fraudulent claims for services that were not in fact provided to those Medicare beneficiaries.

### Manner and Means

19. The manner and means by which MASHALI sought to accomplish the purpose of the scheme and artifice to defraud Medicare included, among other things, the following:

20. MASHALI trained NEPA employees, including physician assistants and registered nurses, to bill Medicare for patient visits using CPT codes 99213 and 99214 even though these CPT codes required provision of services that were not actually provided to the NEPA patients.

21. MASHALI overbooked patient appointments for himself and NEPA's physician assistants, sometimes with as many as four patients per one appointment slot, and arrived to work up to four hours late, causing significant overcrowding at NEPA's waiting rooms. The patient appointments often lasted less than ten minutes and sometimes as few as two to three minutes. Although the number of patients booked per day did not allow MASHALI or NEPA's physician assistants to conduct patient examinations of the scope and length required by CPT codes 99213 and 99214, MASHALI caused these CPT codes to be submitted to Medicare for reimbursement for these patient visits.

22. MASHALI often saw patients without performing physical examinations. With the exception of patients requiring injections, MASHALI conducted patient visits in a small

7

office with a desk, resembling a business office, rather than in an examination room containing medical equipment. Although MASHALI did not conduct physical examinations, the medical records of the patients seen by MASHALI falsely documented extensive physical examinations and coded the visits under either CPT code 99213 or 99214, which MASHALI caused to be submitted to Medicare for reimbursement for services not provided to the patients.

## COUNTS ONE THROUGH NINE
### (Health Care Fraud, in violation of 18 U.S.C. §§ 1347 and 2)

23. The Grand Jury incorporates by reference Paragraphs 1 through 22 as if fully restated and alleged herein.

24. On or about the dates enumerated below, in Massachusetts and elsewhere,

### FATHALLA MASHALI,

the defendant herein, with others known and unknown to the Grand Jury, knowingly and willfully executed and attempted to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United State Code, Section 24(b), that is, Medicare, and to obtain by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, by causing the submission to Medicare of materially false and fraudulent claims for services that were not in fact provided to those Medicare beneficiaries:

| Count | Date of Service | Beneficiary | CPT Code billed |
|---|---|---|---|
| 1 | February 10, 2011 | CB | CPT 99214 |
| 2 | January 29, 2013 | DC | CPT 99213 |
| 3 | November 14, 2012 | PC | CPT 99213 |

| | | | |
|---|---|---|---|
| 4 | October 13, 2010 | DsC | CPT 99214 |
| 5 | July 19, 2012 | JD | CPT 99213 |
| 6 | March 2, 2013 | JM | CPT 99213 |
| 7 | December 13, 2011 | DL | CPT 99214 |
| 8 | December 28, 2012 | MM | CPT 99213 |
| 9 | November 8, 2012 | DP | CPT 99213 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

A TRUE BILL

FOREPERSON OF THE GRAND JURY

ASSISTANT U.S. ATTORNEY

DISTRICT OF MASSACHUSETTS; March 13, 2014

Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK

3/13/14 @ 12:53pm