# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA        . CRIMINAL NO. 14-10067-RWZ
     Plaintiff                  .
                                .
          V.                    . BOSTON, MASSACHUSETTS
                                . FEBRUARY 14, 2014
FATHALLA MASHALI                .
     Defendant                  .
. . . . . . . . . . . . . . . . . . .
```

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE LEO T. SOROKIN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the government:    UNITED STATES ATTORNEY'S OFFICE
                       BY:  Kimberly West, Esq.
                       One Courthouse Way, Suite 9200
                       Boston, MA  02210
                       617-748-3176
                       kimberly.west@usdoj.gov


For the defendant:     Jeffrey A. Denner, Esq.
                       Denner Pellegrino LLP
                       Four Longfellow Place, Suite 3501
                       35th Floor
                       Boston, MA 02114
                       617-227-2800
                       jdenner@dennerpellegrino

Court Reporter:

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

# I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **Government's:** | | | | |
| Clayton Phelps | 5 | 39 | 62 | 64 |

| EXHIBITS | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 1 | Passenger manifest | 7 |
| 2 | Table | 18 |
| 3 | Letter of Recommendation | 19 |
| 4 | Three Certifications | 21 |
| 5 | Wire Transfer Document | 32 |

1  (Case called into session at 3:01:22 p.m.)

2          THE CLERK:  Today is February 14th.  The case of

3  United States v. Mashali, Magistrate No. 14-6022 will now

4  be heard before this Court.  Counsel; please identify

5  themselves for the record.

6          MS. WEST:  Good afternoon, Your Honor, Kim West

7  for the government.

8          MR. DENNER:  Good afternoon, sir, Jeffrey Denner

9  for Dr. Mashali, the defendant.

10          THE COURT:  All right.  We're here for a hearing

11  on the government's motion for detention as well as

12  probable cause?

13          MR. DENNER:  Your Honor, there'll be a

14  stipulation to probable cause so it's just a detention

15  hearing.

16          THE COURT:  All right.

17          MR. DENNER:  And at some point prior to

18  beginning we were hoping to be seen at sidebar.

19          THE COURT:  All right, give me, so probable

20  cause in light of the stipulation I find, on the record

21  before me I find probable cause supports the charge.  Let

22  me just finish reading your filing.

23      PAUSE

24          MR. DENNER:  Your Honor, if that's our filing

25  you're reading there is an additional piece to that which

1   was not electronically filed but I have here.

2          THE COURT:  All right.

3          MR. DENNER:  If and when we get to that point

4   relating to quitclaim deeds and pledges of collateral and

5   escrow agreements and mortgages--

6          THE COURT:  All right.

7          MR. DENNER:  --and Title--

8          THE COURT:  I'll see you; you both want to be

9   seen at sidebar.  I'll see you.

10     (SIDEBAR CONFERENCE – INAUDIBLE)

11         THE COURT:  All right, you ready to proceed,

12  Ms. West?

13         MS. WEST:  Thank you, Your Honor, yes.  The

14  government calls Clayton Phelps, please.

15     GOVERNMENT WITNESS, CLAYTON PHELPS, sworn

16         THE COURT:  Just to, once he states his – why

17  don't you just state your name.

18         THE WITNESS:  Clayton Phelps.

19         THE COURT:  All right, thank you.

20         Just to speed it up I'll take his affidavit in

21  support of the criminal complaint as his direct testimony.

22  I don't think he has to adopt it.  All you have to ask him

23  if something's changed since he signed it, since he signed

24  it before me and then Mr. Denner to the extent he wants to

25  cross him if any of that bears on, to the extent that

1   bears on detention can do so.

2           MR. DENNER:  Your Honor, certainly not, not

3   admitting anything but we'd certainly stipulate that the

4   affidavit is an accurate representation--

5           THE COURT:  Right.

6           MR. DENNER:  --of what he said and what he would

7   do.

8           THE COURT:  And so you can highlight something

9   if you want to but you don't need to go over it.

10          MS. WEST:  That's great.  Thank you very much,

11  Your Honor.

12          THE COURT:  You're welcome.

13          You can be seated.  Thank you.

14          THE WITNESS:  Thank you.

15                  DIRECT EXAMINATION

16  BY MS. WEST:

17  Q.   Mr. Phelps, where have you worked?

18  A.   Excuse me?

19  Q.   Where have you worked?

20  A.   The FBI.

21  Q.   And how long have you worked there?

22  A.   I've worked there approximately eight years.

23  Q.   And have you been involved in the investigation of

24  the defendant, Fathalla Mashali?

25  A.   I have.

Q.   And as a result of your investigation prepared the

affidavit in this case, did you not?

A.   I did.

Q.   And you reviewed that affidavit today?

A.   I have.

Q.   And does it remain true to your knowledge?  Are there

any mistakes in it?

A.   Yes.

Q.   Yes, there are mistakes or it remains true to your

knowledge?

A.   It remains true to my knowledge.

Q.   Thank you very much.  As part of this investigation

did you receive information from Customs Border and

Protection regarding defendant's recent travel plans?

A.   I did.

Q.   What information did you receive?

A.   So on Friday February 7th we learned of Fathalla

Mashali's travel plans to Frankfort with an ultimate

destination of Cairo, Egypt.

Q.   And was that last Friday that you learned that?

A.   It was Friday that I learned of it.

Q.   And when was the flight scheduled?

A.   For Saturday February 8th.

          MS. WEST:  Your Honor, may I approach?

          THE COURT:  Yes.  You don't have to ask again.

1    MS. WEST:  Thank you very much.

2  BY MS. WEST:

3  Q.  So I'm going to show you a piece of paper and have

4  you seen this piece of paper before?

5    MR. DENNER:  Your Honor, we are not disputing

6  the fact that he in fact had these plane reservations, was

7  at the airport, was about ready to board a plane to

8  Frankfort, was going to go on to Cairo.

9    THE COURT:  All right.  So you don't, so you –

10  no objection to the admission of this into evidence?

11    MR. DENNER:  Actually none whatsoever.

12    THE COURT:  Fine.

13    All right, go ahead.  You can keep examining,

14  Ms. West, but the document – are you tendering that

15  document?

16    MS. WEST:  I will, thank you.

17    THE COURT:  So then I'll allow it into evidence

18  as Exhibit 1.

19    GOVERNMENT EXHIBIT NO. 1, ADMITTED

20    MS. WEST:  Thank you.

21  BY MS. WEST:

22  Q.  What is the document I just put in front of you?

23  A.  This is from Lufthansa Airlines.

24  Q.  And what is it, tell the Court?

25  A.  And it's the passenger manifest.

1  Q.   And does it indicate when the ticket was bought for

2  this flight?

3  A.   It does.  Line seven indicates that it was purchased

4  on February 7th.

5  Q.   Is that the day before the flight?

6  A.   It is.

7  Q.   Where was it purchased?

8  A.   And it was purchased in Cairo, Egypt.

9  Q.   And how was it paid for?

10 A.   In cash.

11 Q.   Does it give you an indication of a contact person

12 regarding the ticket?

13 A.   And it does.  On line 12 it indicates that Fathalla

14 Ashraf had purchased that ticket.

15 Q.   All right.

16 A.   He is the contact listed.

17 Q.   And Ashraf is A-S-H-R-A-F?

18 A.   It is.

19 Q.   As a consequence of this information, on Saturday,

20 the following day was material put together for the

21 warrant?

22 A.   It was.

23 Q.   And were you present when Mashali was arrested?

24 A.   I was not.

25 Q.   Do you know where he was arrested?

1   A.   I do.  He was arrested at Logan Airport.

2   Q.   And once he was arrested was he then transported to a

3   local police department?

4   A.   He was.  He was transported to Brookline police

5   department.

6   Q.   During that car ride was it an FBI officer who was

7   accompanying him?

8   A.   Yes.

9   Q.   And during that car ride was there a conversation?

10  A.   Yes, there was.

11  Q.   And what did the FBI make clear to the defendant?

12  A.   He made clear that we were--

13          MR. DENNER:  Your Honor, Your Honor,

14  respectfully I understand that there's relaxed standards

15  and hearsay is not unacceptable here, but I still don't

16  think that we have a foundation – were you in the car too,

17  I don't mean to--

18          THE WITNESS:  I was not.

19          MR. DENNER:  Okay.  I don't think we have a

20  foundation as to why he would know what was said between

21  the other FBI guy and Dr. Mashali.

22          MS. WEST:  Your Honor, this agent is one of the

23  main agents on the case.  This is, I'm just going to talk

24  about statements that were made regarding, on the way to

25  Brook--

1    THE COURT:  Why don't you just ask him if he

2  talked to somebody who was in the car?

3    MS. WEST:  Thank you very much.

4  BY MS. WEST:

5  Q.    Sir, did you speak to FBI Agent Keith Nelson?

6  A.    I did.

7  Q.    And was Mr. Nelson in the car with Mr. Mashali?

8  A.    He was.

9  Q.    And did you speak to Mr. Nelson about his

10  conversation with Mr. Mashali?

11  A.    I did.

12    THE COURT:  The objection's overruled.  Go

13  ahead.

14    MS. WEST:  Thank you very much.

15  BY MS. WEST:

16  Q.    And what did Mr. Nelson say about what Mr. Mashali

17  said in the car?

18  A.    So the conversation began that he had to ask him some

19  of the booking questions from the marshal's booking form.

20  So they're very general questions about his health, about

21  his mental state.  Dr. Mashali indicated that he was

22  severely depressed at which point Agent Nelson asked him

23  if he had plans to hurt himself or any ideations of

24  hurting himself.  He said every day.

25  Q.    Did Mr. Mashali make additional statements to Special

1  Agent Nelson?

2  A.  He did.

3  Q.  Regarding his trip?

4  A.  He did.

5  Q.  What did he say?

6  A.  He indicated he wanted to go to Egypt to see a sick

7  sister.

8  Q.  Did he make any comments regarding his wife's recent

9  travel to Egypt?

10  A.  He did.  He said that she recently went to Egypt and

11  had no problems.  He did not understand why he could not

12  go to Egypt and was having these problems.

13  Q.  And as part of your investigation did you do further

14  research as to whether his wife indeed had gone to Egypt

15  recently?

16  A.  I did.

17  Q.  And when did she go?

18  A.  January of 2014.

19  Q.  Did Mr. Mashali speak any further to Special Agent

20  Nelson?

21  A.  He did.  He indicated that he--

22  Q.  Did he speak?

23  A.  Yes, he did say that he wanted to go there and die

24  and be buried with his parents.

25  Q.  Once--

1      THE COURT:  That was what he generally wanted

2  to do or he wanted to do this on his trip?

3      THE WITNESS:  I don't have the context of that,

4  Your Honor.

5      THE COURT:  Okay.

6      THE WITNESS:  It could have been this trip.  It

7  could have been--

8      THE COURT:  A more generalized desire.

9      THE WITNESS:  Yes.

10  BY MS. WEST:

11  Q.  Once the defendant arrived in Brookline and – strike

12  that.

13      Ultimately was the defendant's luggage gone through?

14  A.  It was.

15  Q.  And was that pursuant to the FBI inventory policy?

16  A.  It is.

17  Q.  And how much luggage did he carry?

18  A.  So he had one carryon bag and one checked piece of

19  luggage.

20  Q.  And were any medications in his bag, found in his

21  bag?

22  A.  There were.

23  Q.  Now I just put a piece of paper in front of you

24  that's a table.  Can you tell the Court what this table

25  is?

1  A.    Sure, this was produced as a result of the

2  medications and so DEA diversion investigator produced

3  this table outlining the medications that were on Dr.

4  Mashali.

5  Q.    And just to be clear these medications were both in

6  his luggage and his carryon?

7  A.    That's correct.

8  Q.    And can you walk us through this table please?

9  A.    Sure.  So the first column indicates the medication.

10  The next column is from the pill bottle, what the

11  prescription for Dr. Mashali was.  The next column is what

12  is an average dose of somebody that's prescribed that

13  medication.  The next column, so the fourth column over is

14  the amount of pills that were in his checked piece of

15  luggage.  The next column, so the fifth column, is the

16  number of pills that were within his carryon and then the

17  last, the final column is about how long these medications

18  could be expected to last given that prescription.

19  Q.    And can you note for me the very first prescription

20  medicine that's listed?

21  A.    Viibrid, viibryd.

22  Q.    And what is that for?

23  A.    That's a major depressive disorder medication.

24        MR. DENNER:  Your Honor, respectfully I guess I

25  wasn't paying attention when we first started talking

1  about this. Is this a list that was basically created

2  based on what was found in the luggage and on his person

3  by the FBI?

4          MS. WEST: I understand that the evidence--

5          THE COURT: By DEA diversion investigator. The

6  FBI and Brookline police tabulated what there was. The

7  DEA diversion investigator prepared this chart based upon

8  what was found.

9          THE WITNESS: Based on the inventory that was

10  created.

11          MR. DENNER: And do we have any information by

12  the expertise of the DEA diversion investigator. I mean

13  there's a lot of very kind of esoteric stuff in here that

14  suggests a certain level of sophistication, training and

15  experience. To me this is, this is unacceptable hearsay

16  or something coming from this witness.

17          MS. WEST: Your Honor, I can speak a little bit

18  more about the source of this information and certainly on

19  that issue. I think Mr. Phelps can be cross-examined on

20  it.

21          THE COURT: Sure.

22  BY MS. WEST:

23  Q.  So you indicated that you got this from the DEA

24  officer?

25  A.  Mmm-hmm.

1   Q.   And do you understand the source of his information

2   in compiling this?

3   A.   Yes.  He used a commonly used application to

4   generate, to determine some of the ailments that these

5   medications are prescribed for and to develop the average

6   daily dose of those.

7   Q.   Okay, so let's back up.  So the name of the

8   prescription that came exactly from looking at the

9   medications, correct?

10  A.   It did, yes.

11  Q.   And the dose indicates per inventory document notes,

12  what does that mean?

13  A.   So exactly what was on the pill bottle and noted on

14  the inventory.

15  Q.   But when we go to the next column, typical adult

16  dose--

17  A.   Yes.

18  Q.   --where did Mr. Nitsbra (ph) get that information?

19  A.   That information would have been obtained from the

20  application that he said that he used.

21  Q.   Okay.  And the quantity in luggage, who obtained that

22  information?

23  A.   That would have been Agent Nelson and Agent Wisnaskis

24  (pH) who was present for that count.

25  Q.   And quantity at Brookline PD, where did that

1 information come from?

2 A.   That came from Brookline's tabulation of the amount

3 of pills remaining as of 2/11/2014.

4 Q.   And then the last column, estimated number of days,

5 what's the basis of that information?

6 A.   That's based on how many pills he is to take per day

7 based on the prescription.

8 Q.   Assuming--

9 A.   Right, right off of the bottle.

10 Q.   Thank you.

11       MR. DENNER:  Your Honor, if I may, I am

12 objecting to this document being testified to any further

13 or coming into evidence.  Even understanding the relaxed

14 standards that exist in detention hearings, this is so

15 much hearsay piled upon hearsay piled upon hearsay.  We

16 still don't understand who the person who is responsible

17 for basically putting this together other than taking the

18 actual information off materials that he had, what their

19 expertise is, what their sophistication is.  We know their

20 type--

21       THE COURT:  I'm going to overrule the objection.

22 I think that the two issues that seem potentially

23 meaningful with respect to the objection are, one) for

24 what purpose does the medication serve, and second) what's

25 a typical adult dose.  The rest is really just a summary.

1    MR. DENNER:  And I would agree with that.  And

2  I would love to have the opportunity to cross examine

3  whomever has decided that's what we have here--

4    THE COURT:  All right.  Well--

5    MR. DENNER:  --because I had no opportunity to

6  do that.

7    THE COURT:  --to the extent you're asking to

8  subpoena and cross examine the diversion, DEA diversion

9  officer, that request is denied without prejudice to renew

10  at a later time, but at the moment I don't see why that

11  that would be that significant and if that changes you can

12  certainly renew it at any time.  I'm going to allow it

13  over your objection.  I think at least so far there's a

14  sufficient foundation for it and there certainly, the rest

15  of the issues that you're raising for the moment seem to

16  me to go more to the weight than the admissibility.

17    MR. DENNER:  Okay.  Thank you, sir.

18    THE COURT:  All right.

19    MS. WEST:  Thank you, Your Honor.

20    THE COURT:  You may proceed, Ms. West.

21    MS. WEST:  So at this point I would move for

22  it's admission.

23    THE COURT:  It's admitted.

24    MS. WEST:  Thank you.

25    THE COURT:  Exhibit 2.

1       GOVERNMENT EXHIBIT NO. 2, ADMITTED

2   BY MS. WEST:

3   Q.   I want to talk a little bit more about the inventory

4   Special Agent Phelps.  Were any documents found in Mr.

5   Mashali's, in his luggage?

6   A.   There were.

7   Q.   And can you tell us about – I'm going to show you

8   another document.  This is a letter--

9   A.   Mmm-hmm.

10  Q.   --from someone named Mustafa Aboshady.  Have you seen

11  this letter before?

12  A.   I have.

13  Q.   And are you familiar with the name Mustafa Aboshady?

14  A.   I am.

15  Q.   Who is that?

16  A.   That is Dr. Mashali's nephew.

17  Q.   And what is his occupation, Aboshady's?

18  A.   He is a physician as well.

19  Q.   I won't go through this whole letter but the first

20  set, the beginning it says this is to certify that

21  Fathalla Mashali M.D. has been working for Medical Care

22  Specialist from December 2004 until the current.  As you –

23  you've read this whole letter, right?

24  A.   I have.

25  Q.   And what does it appear to you to be?

1  A.   It appears to be a letter of recommendation as if

2  seeking a job.

3  Q.   And attached, it's two pages and then we have a third

4  page.  What is the third page?

5  A.   The third page is from the state of Michigan.  So it

6  says if it was notarized on the second page of the letter

7  and this is as if it's the notary's certification is the

8  third page.

9  Q.   And where was this specifically found in his luggage?

10  A.   This was within the carryon.

11         MS. WEST:  I would move for the submission, Your

12  Honor.

13         THE COURT:  All right.  Any objection?

14         MR. DENNER:  No, sir.

15         THE COURT:  It's in evidence as Exhibit 3.

16      GOVERNMENT EXHIBIT NO. 3, ADMITTED

17  BY MR. WEST:

18  Q.   Were other documents found in Mr. Mashali's luggage?

19  A.   They were.

20  Q.   I'm going to show you three pieces--

21         THE COURT:  I just, I'm sorry, but you proceed

22  from this document.

23         MS. WEST:  Yes.

24         THE COURT:  Do you know Agent Phelps on page two

25  of Exhibit 3--

1      THE WITNESS:  Yes.

2      THE COURT:  --the letter from Mr., from Dr.

3  Aboshady it has in addition to the notary's seal a stamp

4  and what appears to be Arabic writing.

5      THE WITNESS:  Yes, sir.

6      THE COURT:  Do you know what that is or says?

7      THE WITNESS:  I do not.  I have not had that

8  translated as of yet.

9      THE COURT:  All right.  Thank you.  Proceed.

10  BY MS. WEST:

11  Q.   I'm going to show you three more documents.

12  A.   Okay.

13  Q.   And these appear to be certifications.  Do you know

14  where these were found?

15  A.   These were also in his carryon luggage.

16  Q.   And have you reviewed these?

17  A.   I have.

18  Q.   And was there one copy of these in the luggage or

19  more than one copy?

20  A.   And so there were numerous copies of each.  Some were

21  on nicer paper if you will.

22  Q.   Was there an original stamp or was it just a copy of

23  the stamp?

24  A.   At least one of them had the original stamp.

25      MS. WEST:  Okay.  Your Honor, I'd move for the

1  admission of these three certifications.

2          THE COURT:  As a group.

3          MR. DENNER:  No objection.

4          THE COURT:  Let me just take - so these will be

5  admitted, I think I'll just admit all three of them as

6  Exhibit 4.

7          MS. WEST:  Thank you.

8          GOVERNMENT EXHIBIT NO. 4, ADMITTED

9  BY MS. WEST:

10  Q.    Sir, as regards identification what was found on Mr.

11  Mashali's person?

12  A.    He had his Egyptian passport, his legal permanent

13  resident card and his Massachusetts driver's license.

14  Q.    And did he have any passport photos of himself?

15  A.    Yes.  There was like one of those passport photo

16  carriers and so there was one passport photo of him and

17  the other spot where there would be a second photo was

18  blank.

19  Q.    Did he have any photos of anyone else?

20  A.    Yes.  There was also another carrier that he was

21  carrying which had pictures of his wife, Noha Elkadry.

22  Q.    How many photos?

23  A.    And there were two in the carrier for his wife.

24  Q.    Now as part of your investigation has there also been

25  a financial review done of Mr. Mashali's assets?

1  A.   There has been.

2  Q.   And what's the timeframe of that review?

3  A.   And so that is of February of 2009 until May of 2013.

4  Q.   In December of 2008 did the defendant file for

5  bankruptcy?

6  A.   He did.

7  Q.   What type?

8  A.   Chapter 11.

9          THE COURT:  December when, 2013?

10 BY MS. WEST:

11 Q.   What year was it?

12 A.   No, that was 2008.

13         THE COURT:  2008.

14 BY MS. WEST:

15 Q.   And was that ultimately converted to Chapter 7?

16 A.   It was and that was in February of 2010.

17 Q.   And how much liability was in the bankruptcy?

18 A.   Approximately $12 million.  Six million of that was

19 Department of Labor charges so he was withholding for

20 employee benefits like their retirement but was not

21 contributing to those accounts.

22 Q.   Was NEPA, NEPA's the name of his company, correct?

23 A.   Correct.

24 Q.   And was NEPA still operating during the course of the

25 bankruptcy?

1  A.    They were.

2  Q.    When was the bankruptcy discharged?

3  A.    It was discharged in June of 2011.

4  Q.    I want to review with you now the real estate

5  relative to Mr. Mashali.  Do you know where his primary

6  residence is?

7  A.    I do.

8             THE COURT:  I'm sorry; before we do that I just

9  want to--

10             MS. WEST:  Yes.

11             THE COURT:  --stop you back on the money for a

12  minute just so I'm clear.  That was personal bankruptcy?

13  That was he went into bankruptcy?

14             THE WITNESS:  That was--

15             THE COURT:  Was that the bankruptcy of his

16  business?  It was him in bankruptcy, that's what I

17  understood you to say.

18             THE WITNESS:  I'm sorry.

19             THE COURT:  That was too many questions.

20             THE WITNESS:  You're both talking, sorry.

21             THE COURT:  So my question is this, the

22  bankruptcy you just described--

23             THE WITNESS:  Yes.

24             THE COURT:  --that was Dr. Mashali personally in

25  bankruptcy?

1           THE WITNESS:  Yes.

2           THE COURT:  He personally--

3           THE WITNESS:  Filed for bankruptcy.

4           THE COURT:  --filed for bankruptcy and that's

5    the $6 million to Department of Labor plus another $6

6    million in debts?

7           THE WITNESS:  Exactly.

8           THE COURT:  All right.  If you know, prior to

9    him filing for bankruptcy did he work or operate the,

10   essentially the medical practice business described in the

11   complaint or was he in some other business?

12          THE WITNESS:  I do not know the exact date that

13   he opened New England Pain Associates.

14          THE COURT:  I see.  So it might have been,

15   you're not sure if it was before then or not?

16          THE WITNESS:  Exactly.

17          THE COURT:  Okay.

18          THE WITNESS:  I believe it was before but I

19   don't know exactly how long.

20          THE COURT:  All right.  Okay.  Proceed, sorry.

21          MS. WEST:  Thank you.

22   BY MS. WEST:

23   Q.   So now we're going to move to houses.  Do you know

24   where his primary residence is?

25   A.   I do.  It is in Dover.

1  Q.   And when was that home bought?

2  A.   And so that was purchased in December of 2011.

3  Q.   So is that after the bankruptcy was filed?

4  A.   And so that was the same year but six months later.

5       THE COURT:  Six months after the discharge.

6       THE WITNESS:  Yes, six months after the

7  discharge of the bankruptcy.

8       MS. WEST:  Thank you.

9  BY MS. WEST:

10 Q.   Do you know what the sale price was for that house?

11 A.   Yes, it was $2.2 million approximately.

12 Q.   Do you know what the mortgage was at the time of

13 this, the purchase?

14 A.   It was $1.7 million.

15 Q.   Was the house also appraised at that time?

16 A.   It was.  It was appraised for $2.8 million.

17 Q.   And subsequent to December--

18      THE COURT:  It was appraised for 1.8 at the time

19 of purchase?

20      THE WITNESS:  Appraised for 2.8.

21      THE COURT:  2.8.

22      MR. DENNER:  Your Honor, if I may.  I fail to

23 see the relevance of a house bought.  We don't even know

24 who bought the house.  Because he was living there doesn't

25 mean he had any financial responsibility or relationship

1   to it.

2          THE COURT:  I overrule it.  To the extent you're

3   objecting to the relevance of these questions I overrule

4   it.  I think what you're getting at goes to more the

5   weight of the evidence and either you or Ms. West or both

6   can inquire about it.

7          MR. DENNER:  Okay.  Thank you.

8   BY MS. WEST:

9   Q.   So sir, at the point of buying the house in now

10  December 2011 to May 2013, so for approximately two years,

11  were improvements made to that house?

12  A.   There were.

13  Q.   And do you have an estimate about how much money went

14  into the house for the improvements?

15  A.   It was over $2 million in improvements made to the

16  residence and property.

17  Q.   And do you know what the improvements were?

18  A.   I do.

19  Q.   What were they?

20  A.   A pool was put in with a surrounding patio and an

21  outdoor kitchen, a four-car carriage house that also

22  included a squash court and 20 seat home theater.  The

23  basement of the main house was finished.  The garage was

24  repaved using pavers and it was heated.  Pillars were put

25  at the end of the driveway with a closable gate.

1 Q.   And did the financial investigation also include a

2 review of how those improvements were paid for?

3 A.   Yes, a substantial amount of that came from the NEPA

4 accounts.

5 Q.   And have you also reviewed the mortgage payments for

6 that house for 2012?

7 A.   I have.

8 Q.   And from whose account were those payments made?

9 A.   Many of those payments came from the wife's account.

10 Q.   And for the year of 2012 how much was the wife's

11 account worth?

12 A.   $1.2 million.

13 Q.   And did you look into how that money got into the

14 wife's account?

15 A.   Yes, one million of that came from the NEPA account.

16 Q.   So now I want to talk about some other houses--

17          THE COURT:  When was that?

18          THE WITNESS:  That was 2012.

19 BY MS. WEST:

20 Q   I want to turn to some other houses.  Are there also

21 two other houses in Dover?

22 A.   There are.

23 Q.   And were those homes bought before this primary

24 residence?

25 A.   They were.  They were bought in 2004 and 2005.

1  Q.   And if you remember do you know how much the

2  mortgage was on the 2005 home?

3  A.   That one was $1.7 million.

4  Q.   And then there was another home bought earlier in

5  2004.  Do you know what the mortgage was on that one?

6  A.   That one was approximately $900,000.

7  Q.   Was that the mortgage or the sale price?

8  A.   That was the mortgage.

9  Q.   Moving from Dover to Rhode Island--

10 A.   Mmm-hmm.

11 Q.   --was there also a home in Rhode Island bought in

12 July of 2004?

13 A.   Of 2004 as well, yes.  In Lincoln, Rhode Island there

14 was another home purchased and again this is a mortgage

15 value of approximately 560,000.

16 Q.   And finally if we can go to Florida--

17        THE COURT:  These mortgage values at the time of

18 purchase?

19        THE WITNESS:  At the time of purchase.

20 BY MS. WEST:

21 Q.   If we could move to Florida to two other residences

22 in Fort Lauderdale were those also bought in 2004 and

23 2005?

24 A.   2004 and 2005, yes, ma'am.

25 Q.   And the 2004 home, do you know the sale price or the

1  mortgage?

2  A.   The sale price was 535,000 and the mortgage was

3  347,000.

4  Q.   And that one that was bought the following year, do

5  you know the sales price and the mortgage?

6  A.   The sale price was 820,000 and the mortgage was

7  654,000.

8  Q.   Those particular homes are those held with, with

9  another person?

10 A.   Yes.

11 Q.   Do you remember who that is?

12 A.   I remember Usef and I do not recall offhand the last

13 name.

14 Q.   And do you know now and counting up all five of these

15 houses are they rented?

16 A.   The five other than the primary residence are rented.

17 Q.   Okay.  As part of your investigation--

18         THE COURT:  Year round or are these vacation

19 properties with sort of short term rentals?

20         THE WITNESS:  I do not know.  All we know is

21 that they are rented and they receive rental income.

22 BY MS. WEST:

23 Q.   As part of your investigation did you also see what

24 type of cars are associated with Mr. Mashali?

25 A.   I know of four high end luxury SUVs.  There's a 2011

1   Mercedes G550.  There's a 2012 Porsche Cayenne.  There's

2   a 2012 Audi Q5 and there's a 2013 Lexus GX570.

3   Q.   And in whose names are these cars?

4   A.   These are all in the wife's name.

5   Q.   Were they bought subsequent to the bankruptcy being

6   discharged?

7   A.   Yes.

8   Q.   Now I'd like to move wires going out of their

9   accounts.  Do you understand that the defendant had wired

10  money overseas in recent years?

11  A.   I do.

12  Q.   And what is the timeframe of those wires?

13  A.   Sure, so from February 2009 until May of 2013 a

14  significant amount of money was wired overseas.

15  Q.   Okay.  To where?  What countries was it wired to?

16  A.   To Egypt.

17  Q.   Was there another country involved as well?

18  A.   I do--

19  Q.   Okay.

20  A.   I do not recall the other country.  Yeah, I'm sorry,

21  Cyprus.

22  Q.   And how much money was wired during that timeframe?

23  A.   Approximately $1.7 million.

24  Q.   And were these wires made while the bankruptcy

25  proceeding was going on?

1  A.   Yes, they were.

2  Q.   When was the most recent wire?

3  A.   In May of 2013.

4  Q.   And looking back to the year before in 2012 was there

5  one day in which a fairly large wire went out?

6  A.   Yes.  In fact it was two wires on the same day

7  totaling $376,000.

8  Q.   Do you remember when that was in 2012?

9  A.   Yes, that was in May of 2012.

10 Q.   And from whose account did those wires go out?

11 A.   And it went from his wife's account.

12 Q.   And I'm sorry, you said it was 376,000?

13 A.   Correct.

14 Q.   Who's the beneficiary of those wires?

15 A.   New Urban Communities.

16 Q.   And in the course of this investigation have you done

17 some research on that?

18 A.   I have.

19 Q.   What is New Urban Communities?

20 A.   It is a residential property development company.

21 And what - are there restrictions regarding the identity

22 of the buyers for this community?

23 A.   There are.  They must be Egyptian Nationals to

24 purchase properties within these locations.

25 Q.   And what's the source of your information regarding

1  this?

2  A.   From their direct website.

3  Q.   Does the website reflect the project objectives for

4  this community?

5  A.   It is seeking to have involvement from Egyptian

6  Nationals abroad.

7  Q.   Do you understand that this is a residential

8  community or?

9  A.   I do, a residential.

10       MS. WEST:  Your Honor, I'd ask for admission of

11  that document.

12       THE COURT:  Any objection?

13     PAUSE

14       THE COURT:  Mr. Denner, any objection?

15       MR. DENNER:  No.

16       THE COURT:  Exhibit 5 is in evidence.

17     GOVERNMENT EXHIBIT NO. 5, ADMITTED

18       MR. DENNER:  Your Honor, again I do say this,

19  we're talking about what might go to the weight of the

20  evidence rather than it's admissibility, but to the extent

21  that I would look for a continuing objection to the

22  relevance for much of this you can add that as well.

23       THE COURT:  You can have that.

24  BY MS. WEST:

25  Q.   Sir, as part of your investigation did you have the

1  opportunity to interview a Dr. Mona Arabi?

2  A.    I did.

3  Q.    And who is she?

4        THE COURT:  Mona who?

5        MS. WEST:  Mona Arabi, A-R-A-B-I.

6  BY MS. WEST:

7  Q.    Who is she?

8  A.    She was a physician that Dr. Mashali sought her

9  assistance following our search warrants.

10  Q.    And is she mentioned in your affidavit?

11  A.    She is.

12  Q.    And how long did she come to NEPA?

13  A.    She was there for approximately two weeks.

14  Q.    And is this subsequent to the defendant losing his

15  license?

16  A.    Yes.

17  Q.    In your interview with her what did she tell you

18  about the reason why she was coming?

19  A.    Because, she was told that Dr. Mashali was going to

20  be undergoing prostate cancer surgery and that he needed

21  somebody to cover the practice.

22  Q.    Who told her that?

23  A.    Dr. Mashali told her that.

24  Q.    And ultimately when she got here what did she find

25  out?

1   A.   She found out in fact that she was here because he

2   had lost his license to practice.

3   Q.   What did she tell you that Dr. Mashali told her about

4   her payment for the services?

5   A.   He offered to pay her any way she wanted which would

6   include payment from an overseas account in Egypt if she

7   wanted to receive her payment that way.  She indicated

8   that he had told her all the taxes have been paid on it.

9   I can pay you from that so you don't have to pay taxes.

10  Q.   And what did she say in response?

11  A.   She said absolutely not, I have an S Corp set up, all

12  of my money goes through that.

13  Q.   As part of this investigation did you become familiar

14  with the company's compugroup and health fusion?

15  A.   I did.

16  Q.   What are those?

17  A.   So those are online storage of the patient progress

18  notes and their patient files.

19  Q.   And recently did you receive information regarding

20  Dr. Mashali's accounts with those companies?

21  A.   I did.  As of November we learned that he was no

22  longer paying them to maintain those patient files.

23  Q.   In addition to your own investigation, did the Rhode

24  Island Board of Medicine conduct an investigation of Dr.

25  Mashali?

1  A.  They did.

2  Q.  And what was that investigation about?

3  A.  So in April of 2013 they subpoenaed seven patient

4  files regarding patient deaths.

5  Q.  And when you say subpoena who did they subpoena?

6  A.  They subpoenaed Dr. Mashali's office NEPA.

7  Q.  When did their findings come out?

8  A.  In August of 2013.

9  Q.  What were their findings?

10 A.  Their findings were that six of those patients the

11 level of care was substandard based on the level of care

12 that a patient should expect to receive from a physician.

13 Q.  And as a result of that investigation what happened

14 to his license?

15 A.  His license was suspended as a result of that.

16 Q.  And that's his Rhode Island license, correct?

17 A.  That's his Rhode Island license.

18 Q.  And a few days later what happened with his

19 Massachusetts license?

20 A.  He voluntarily surrendered his Massachusetts license.

21 Q.  And ultimately what happened to his DEA

22 registrations?

23 A.  He also voluntarily surrendered his DEA registration.

24 Q.  And does he now have the ability to practice medicine

25 or prescribe in the United States?

1  A.   He does not.

2  Q.   During the course of your investigation, have you

3  also reviewed the defendant's international travel?

4  A.   I have.

5  Q.   And what is the timeframe of your, of the review that

6  you did?

7  A.   It was from 2008 until 2012 I believe.

8  Q.   If I told you it was 2009 would that help you

9  remember the exact time?

10 A.   Yes.

11        MR. DENNER:  I wasn't aware that he had a

12 failure of memory there.

13        MS. WEST:  Thank you, Mr. Denner, that's

14 correct.

15        THE COURT:  He didn't have a failure of memory.

16 She impeached him.

17 By MS. WEST:

18 Q.   Sir, in the course of time how many trips,

19 international trips and trips outside the United States

20 would you say the defendant took?

21 A.   There were 10 that the defendant took.

22 Q.   And how many did his wife take?

23 A.   She took nine.

24 Q.   And of all those trips were any of those trips with

25 the defendant to Egypt?

1  A.   They were.

2  Q.   When were those trips?

3  A.   They were in September of 2012 and--

4       THE COURT:  This is for the defendant now?

5       THE WITNESS:  Yes.  And November of 2012.

6  BY MS. WEST:

7  Q.   And as regards to the first trip, the September,

8  excuse me, as regards to the November trip when was the

9  reservation for that trip made?

10 A.   It was, the reservation was made in September 2012.

11 Q.   And as regarding the other trip you mentioned 2012,

12 when was the reservation made for that?

13 A.   April 2012.

14      MS. WEST:  Thank you, sir.  Thank you, Your

15 Honor.

16      THE COURT:  Just I have one or two questions

17 just to clarify before you cross examine, Mr. Denner, just

18 so I understand here.  The properties you spoke, the

19 primary residence and then the five, putting aside the

20 Fort Lauderdale properties for a moment--

21      THE WITNESS:  Okay.

22      THE COURT:  --those properties, were those

23 purchased in whose name if you know?

24      THE WITNESS:  So the, the two Dover properties

25 and the Lincoln, Rhode Island property are joint with his

1  spouse.

2       THE COURT:  Defendant and his wife?

3       THE WITNESS:  The defendant and his wife, yes,

4  sir.

5       THE COURT:  The primary residence?

6       THE WITNESS:  The primary residence is held in a

7  trust and it's, the trust is Pine, it's on Pine Street and

8  so the trust is Pine something and Noha Elkadry Mashali is

9  the trustee--

10      THE COURT:  That's his wife.

11      THE WITNESS:  --of that trust.  That is his

12 wife.

13      MR. DENNER:  That would be the wife, Your Honor,

14 yes.

15      THE COURT:  And you don't know who the

16 beneficiaries are?

17      THE WITNESS:  I do not.

18      THE COURT:  All right.  And--

19      THE WITNESS:  There is a stipulation of the

20 beneficiaries that the beneficiary cannot be a minor.

21      THE COURT:  Oh.  And do you know the source of

22 the cash portion of the purchase price either for the

23 primary residence or the other property?

24      THE WITNESS:  I do not know the source of any of

25 the cash.

1    THE COURT:  Okay.  All right.  Go ahead, Mr.

2 Denner.

3                    CROSS EXAMINATION

4 BY MR. DENNER:

5 Q.   Good afternoon, sir.

6 A.   Good afternoon.

7 Q.   I think we met earlier.  I'm Jeffrey Denner.  I'm

8 representing Dr. Mashali.

9 A.   Yes, sir.

10 Q.   Now sir, is, I think you testified that, that you

11 felt that Dr. Mashali was depressed, indicated he'd been

12 depressed?

13 A.   Correct.

14 Q.   Was there any indication of how long that depression

15 had been in place?

16 A.   He did not indicate that.

17 Q.   And I believe in, at some point perhaps – strike

18 that.

19    Are you familiar at all, have you read the pretrial

20 services report that September Brown has created for Dr.

21 Mashali after speaking with him today?

22 A.   The pretrial report that was--

23 Q.   Pretrial services report done by--

24 A.   That was shown to us today?

25 Q.   Yes.

1    A.    I--

2    Q.    Glanced through it?

3    A.    Got the cliff notes version if you will.

4    Q.    Okay.  Did you happen to notice in there that Dr.

5    Mashali admitted to September Brown that for the last

6    several months he had felt very depressed about what was

7    going on in his life with the loss of his licenses, the

8    inability to practice medicine?

9    A.    Sure.

10   Q.    Is it the government's theory that he was going to

11   Egypt to kill himself?

12   A.    Not necessarily.

13   Q.    I see.  Is it the government's theory that if he

14   stays here he's at risk of killing himself?

15            MS. WEST:  Objection, Your Honor.  I don't think

16   this witness can answer those questions.

17            THE COURT:  Sustained.  I don't think he can

18   speak to the government's theory.

19   BY MR. DENNER:

20   Q.    Is it your theory?

21   A.    No.

22   Q.    Okay.  So you are saying right here today that you

23   don't believe that he's at risk to kill himself; is that

24   correct?

25            THE COURT:  That's a different question.

1  A    Again, I'm not in his mind.  I do not know--

2            THE COURT:  I'm going to sustain an objection to

3  that question only cause I don't think that the agent as

4  much as they teach people at the academy in Quantico is

5  qualified--

6            MR. DENNER:  Okay.

7            THE COURT:  --to opine on whether somebody is a

8  risk of suicide or not.

9  BY MR. DENNER:

10 Q.   With regard to, sir, with regard to the pills that

11 were found on him and the chart that was developed--

12 A.   Yes.

13 Q.   --what do you know about the individual who developed

14 that, the DEA diversion guy?

15 A.   I've worked with him for numerous years, multiple

16 years.  He's a great guy, shows up to work, does a great

17 job every time I've worked with him.

18 Q.   That's good to know.  With regard to what the import

19 of that chart suggests to you, do you believe that the

20 number of pills that he had with him is significant?

21 A.   I do.

22 Q.   And what is the significance you attribute to that?

23 A.   The volume for the weeklong trip that Dr. Mashali was

24 supposedly taking.  Seems as though the number of pills on

25 him was a little bit excessive.

1  Q.   Are you suggesting that if he were going to stay

2  longer than a week, let's say he planned to go there for

3  months--

4  A.   Mmm-hmm.

5  Q.   --he's a doctor, he's an Egyptian, are you suggesting

6  he could have gotten whatever pills he wanted very easily

7  over there?

8  A.   Again, I can't make that assessment.

9  Q.   And with regard to the pills that he did have did he

10 have multiple containers for some of the pills that had

11 more?

12 A.   So there were the ones on his, in his carryon and

13 then there were the ones in his checked bag.  So some of,

14 some of the ones did have multiple bottles for the same

15 type of medication.

16 Q.   Because some were in his carryon and some were in his

17 regular checked baggage, correct?

18 A.   Correct.

19 Q.   So be fair to say that a prudent person, particularly

20 a doctor who might think his checked baggage could be

21 lost, would want to make sure that he would have

22 medication when he actually got there would be a prudent

23 thing in fact to have some on his carryon as well?

24 A.   Yes.

25          The COURT:  You said the trip was one week.  Was

1 this a roundtrip?

2       THE WITNESS:  It was a roundtrip ticket, yes,

3 sir.

4       THE COURT:  Seven days.

5       THE WITNESS:  Seven days.

6 BY MR. DENNER:

7 Q.  And he had that roundtrip ticket on him when you got

8 there, yes?

9 A.  I was not there.

10 Q.  But did you talk to anyone who was there?

11 A.  I did.

12       THE COURT:  Well actually he probably didn't

13 have a ticket on him cause it was probably--

14       THE WITNESS:  Could be an E-ticket.

15       THE COURT:  There's no paper ticket that--

16       THE WITNESS:  I do not know that.

17       MR. DENNER:  Electric ticket, electric ticket,

18 got it.

19 BY MR. DENNER:

20 Q.  Now, sir, with regard to his travel over time was

21 this the first time he'd ever travelled to Egypt to the

22 best of your knowledge?

23 A.  No.  I just described two others.

24 Q.  And in fact travelled to Egypt and his wife as well

25 on numerous occasions, correct?

1  A.   Correct.

2  Q.   And you talked about some residential community that

3  was

4  over there, yes?

5  A.   Correct.

6  Q.   You also talked about a great variety of houses that

7  he and/or his wife had bought over the years?

8  A.   Yes.

9  Q.   You've done some profile of his financial situation

10 over the years?

11 A.   Yes.

12 Q.   So you're undoubtedly aware that back in 2001, two,

13 three, four, that area he actually had a very big company

14 that was doing quite well, correct?

15 A.   Yes.

16 Q.   And he had at one point over 50 employees and was

17 making quite a great deal of money, correct?

18 A.   Correct.

19 Q.   And at some point the total amount of his employees

20 actually exceeded a thousand, right?  If you know?

21 A.   I do not know that.

22 Q.   Well based on the number of places he had and the

23 nature of what he was doing would it be fair to say he

24 certainly had in the multi-hundreds if not thousand?

25 A.   Again, I do not know that on the four locations that

1  I'm aware of that he operated.

2  Q.   And is it unusual in your experience as an FBI agent

3  who does this kind of financial profiling for individuals

4  that are making great deals of money to get involved in

5  different investments?

6  A.   Yes.

7  Q.   And is it – it is unusual or it's not?

8  A.   No, it is reasonable.

9  Q.   And that would generally, if it were real estate you

10 would buy real estate for investment purposes, put some

11 money down and have some equity in it, correct?

12 A.   Yes.

13 Q.   And isn't that pretty much what he did during those

14 time periods?

15 A.   He did.

16 Q.   And he's an Egyptian; he's still an Egyptian citizen.

17 In your investigation did you form the opinion that in

18 fact he still had business interest and business contacts

19 in Egypt?

20 A.   Yes.

21 Q.   And would it be fair to say it's not particularly

22 unusual when he had monies earlier to be investing over

23 there; is that correct?

24 A.   I can't state to his motives.

25 Q.   Does it seem unusual to you that he would do that?

1  A.   No.

2  Q.   And I think you said he was going through a

3  bankruptcy proceeding?

4  A.   He did go through a bankruptcy proceeding.

5  Q.   And he did.  And he was discharged in that bankruptcy

6  was he not?

7  A.   He was.

8  Q.   And when did that discharge occur?

9  A.   That was June of 2011.

10  Q.   All right.  And to you what does a discharge suggest?

11  A.   That the, it was over.

12  Q.   And do you have an knowledge of any fraud that was

13  alleged in this bankruptcy?

14  A.   I do not know of any bankruptcy fraud.

15  Q.   And so basically this was a bankruptcy that was

16  commenced, presumably he was represented by counsel, there

17  were trustees in bankruptcy, it was investigated and he

18  was discharged, correct?

19  A.   Correct.  I understand the Department of Labor is

20  still suing, suing for that half of the liabilities of the

21  $6 million.

22  Q.   And do you know whom they're suing?

23  A.   Dr. Mashali.

24  Q.   I see.  And that's because that particular debt is

25  not dischargeable in bankruptcy?

1   A.    Correct.

2   Q.    Okay.  And with regard to the different houses or

3   investments that were made subsequent to the discharge in

4   bankruptcy, do you find that to violate any laws?

5   A.    No.

6   Q.    And do you have some sense of what Mrs. Mashali who's

7   also a periodontal dentist and has her own practice, do

8   you have any sense of how much money she makes every year?

9   A.    I do, ummm--

10   Q.    Yes or no?

11   A.    Yes.

12   Q.    Okay.  And would it be fair to say that with regard

13   to the monies that have been invested post-bankruptcy, do

14   you know where they have come from?

15   A.    From their practices.

16   Q.    Okay.  And the wires that went overseas, do you know

17   where they have come from?

18   A.    Primarily from Dr. Mashali's practice.

19   Q.    And that's all post-bankruptcy?

20   A.    Correct.

21   Q.    And there's been--

22   A.    Well during the bankruptcy.  I mean all the way back

23   to February of 2009 he was wiring significant sums of

24   money which was right in the midst of his bankruptcy.

25   Q.    And have you brought that to the attention of the

1  bankruptcy court that some fraud has been purported--

2  A.   I have not.

3  Q.   --on that?

4  A.   I have not.

5  Q.   And why would that be?

6  A.   I just learned of it.

7  Q.   I see.  Do you intend to do that?

8  A.   That is possible.

9  Q.   And you don't know if the monies that were sent

10 during that time period were actually part and parcel of

11 issues that were considered in the bankruptcy, do you?

12 A.   Repeat the question, I'm sorry.

13 Q.   You talked about monies that you believe were wired--

14 A.   Mmm-hmm.

15 Q.   --during the time it was an active bankruptcy of this

16 individual?

17 A.   Yes.

18 Q.   Do you know if those issues were taken up by the

19 bankruptcy court during the pendency of the bankruptcy?

20 A.   I do not know that.

21 Q.   And with regard to the properties that I think you

22 talked about, a residential community that's been, an

23 investment's been made by Mashali; is that correct?

24 A.   Correct.

25 Q.   Both Dr.'s Mashali, correct?

1  A.    Correct.

2  Q.    As far as you know?

3  A.    We did not touch on it, but I can explain a little

4  bit further.  So the three--

5  Q.    Well if I ask you a question about it that'll be a

6  good time.

7  A.    Okay.

8  Q.    And with regard to that you said this was a

9  residential community that was kind of geared toward

10  bringing back money from Egyptian Nationals oversea?

11  A.    Correct.

12  Q.    And would it be fair to say that part of the selling

13  of this idea to them was that they would put money into

14  this and the property would accrue more value and they

15  would be able to sell that and make more money?

16  A.    I cannot speak to their motives.

17  Q.    I see.  But there's nothing that you know about that

18  makes it any different than any other investment, is it?

19  A.    Correct.

20  Q.    Is it an illegal investment?

21  A.    No.

22  Q.    Is there something about this I don't understand that

23  would preclude someone from investing in Egypt, Kansas or

24  anywhere at all if they had the money?

25  A.    No.

1  Q.   Be fair to say you did a fairly, be fair to say you

2  did a fairly intensive investigation of Dr. Mashali over

3  the past couple of years?

4  A.   Yes.

5  Q.   So you got to kind of understand what his family life

6  was like as well and what his family is comprised of?

7  A.   Yes.

8  Q.   Okay.  And do you know how many children he has?

9  A.   It is either three or four, I forget which.

10 Q.   And do you know their approximate ages?

11 A.   I believe it ranges from two to 14.

12 Q.   I see.  And are they U.S. citizens?

13 A.   Yes.

14 Q.   And be fair to say they're enrolled; most of them, at

15 least probably not the two year old but the others are

16 enrolled in private schools in the United States?

17 A.   Yes.

18 Q.   And have been here basically their whole life?

19 A.   Right.

20 Q.   How long has Dr. Mashali been here?

21 A.   Since 1983.

22 Q.   I see.  And that would be some 30 years, 31 years?

23 A.   Right.

24 Q.   And do you know of his military service at all?

25 A.   I understand from his application that he said that

1  he was in the military but I do not know of his actual

2  service.

3  Q.   So he could be making that up?

4  A.   That's not what I'm alleging.

5  Q.   Okay.  But it'd be fair to say that on the record

6  that you have he is an honorably discharged United States

7  Army captain, correct?

8  A.   Again, I did not know the exact specific--

9  Q.   Have you looked into that?

10 A.   I have not.

11 Q.   Okay.  And he has a wife?

12 A.   Yes.

13 Q.   And is she a U.S. citizen?

14 A.   Yes.

15 Q.   And what is her name?

16 A.   Elkadry Mashali.

17 Q.   And do you know how long they've been married?

18 A.   I do not know exactly how long they've been married,

19 no.

20 Q.   But they live together?

21 A.   Yes.

22 Q.   And they've lived together for at least, some

23 period--

24 A.   I'm guessing, I'm guessing 14 years--

25 Q.   --some period of time.  Some period of time at least.

1  A.   --at least that long.

2  Q.   At least 14 years and perhaps as long as 20 or 21

3  years?

4  A.   Sure.

5  Q.   And you know that Dr. Mashali practices in dentistry

6  here as well.  You know she has an active practice,

7  correct?

8  A.   I do.

9  Q.   And you know that she is investing with her husband?

10  A.   Yes.

11  Q.   Now you indicate that you learned last Friday that he

12  was going to Egypt?

13  A.   I did.

14  Q.   And when was the last time he went to Egypt?

15  A.   It was September 2012.

16  Q.   I see.  And was he--

17  A.   I'm sorry, November 2012.

18  Q.   And when did the investigation of him begin?

19  A.   July of 2012.

20  Q.   So the investigation was ongoing when he went to

21  Egypt last time too, correct?

22  A.   Correct.

23  Q.   And did he come back?

24  A.   He did.

25  Q.   He did.  Do you know how long he went to Egypt for

1   that time?

2   A.   I believe that was two weeks.

3   Q.   I see.  And do you know what he went for?

4   A.   I do not know.

5   Q.   But you do know he has legitimate business interest

6   in Egypt,--

7   A.   I do.

8   Q.   --correct?

9   A.   Correct.

10   Q.   Has it come to your attention other than from me that

11   certain monies had been, from these investments had been

12   coming back to the states for him for a period of time?

13   A.   Coming back to--

14   Q.   Yes.

15   A.   --the United States?

16   Q.   Yes.

17   A.   I do not know that.  I know of money going over.  I

18   do not know of money coming back.

19   Q.   So you are not aware of approximately $7,000 a week

20   coming from the Central Bank--

21          THE COURT:  A week or monthly?

22          THE WITNESS:  Recently $7,000 a week coming

23   back.

24   BY MR. DENNER:

25   Q.   Okay.  So you do know about that?

1  A.   Yes, I'm sorry.

2  Q.   Oh, that's okay.

3  A.   Yes.

4  Q.   And for, do you know for how long that money's been

5  coming back into the states?

6  A.   And so I believe that that was around September of

7  2013.

8  Q.   All right.  So since September of - if it's

9  approximately $30,000 a week from September to now would

10  be about six

11  months--

12  A.   $30,000 a week?

13  Q.   Excuse me, a month.  Approximately $30,000 a month

14  since September has been coming back into the United

15  States, correct?

16  A.   Mmm-hmm.

17  Q.   And be fair to say that was about the time when this

18  investigation started to heat up and perhaps he was

19  looking for legal counsel--

20  A.   Sure.

21  Q.   --to defend these issues, right?

22  A.   Right.

23          THE COURT:  Do you know the source of the $7,000

24  a week?

25          THE WITNESS:  I do not.  All we have seen is

1 Western Union or Money Grams coming back.

2 BY MR. DENNER:

3 Q.   If I suggest to you that it's coming, have you done

4 any investigation relative to the business interest he

5 actually has in Egypt right now and whether in fact the

6 money is coming from those business interests?

7 A.   It's a little easier to find things in the United

8 States than it would be from Egypt.

9 Q.   I understand.  So you have not been able to do that?

10 A.   Correct.

11 Q.   Is it your sense that if he were having some plan in

12 fact to get out of the United States that he'd be bringing

13 hundreds of thousands of dollars back and spending it

14 here?

15 A.   I do not know that.

16 Q.   Are you aware of the fact that since he's lost his

17 ability to practice medicine that his wife is redoubling

18 her efforts to enlarge her practice?

19 A.   I was not aware of that.

20 Q.   Have you been investigating that at all?

21 A.   I am not investigating his wife.

22 Q.   Is anybody investigating his wife--

23         MS. WEST:  Objection.

24 BY MR. DENNER:

25 Q.   --about these things?

1    THE COURT:  Sustained.

2  BY MS. WEST:

3  Q.   In your investigation of his business practices in

4  terms of investment, all the houses that he purchased,

5  real estate he's purchased either here or overseas has

6  there been anything illegal about that that you have found

7  to be, be the case?

8  A.   No.

9  Q.   And you looked at it pretty closely?

10 A.   I did.

11 Q.   With regard to the pills that he took over there,

12 you've indicated that the duplications basically were, the

13 duplicate pill containers were contained in his carryon

14 versus his checked luggage, correct?

15 A.   Correct.

16 Q.   And when you go on trips do you sometimes just grab

17 your prescription medications and put it in your bag?

18 A.   I would carry it in my carryon.

19 Q.   Or your carryon, you grab it and put it on your

20 carryon, and do you normally count how many pills are in

21 there to make it exactly match how long you expect to be

22 gone?

23 A.   No.  I would ensure there was enough in my carryon.

24 Q.   And again, he had a ticket to come back in about a

25 week?

1  A.    Correct.

2  Q.    You indicate that at this point in the investigation

3  had he not booked passage and attempted to get on a plane

4  to go to Egypt would you have arrested him?

5            MS. WEST:  Objection.

6            THE COURT:  Sustained.

7  BY MS. WEST:

8  Q.    Was your investigation of Dr. Mashali, had it reached

9  a point where--

10           THE COURT:  He's got to finish the question

11  first.

12           MS. WEST:  Well I'm not sure where that could go

13  anywhere.  That's not objectionable.

14           THE COURT:  Well you can finish the question.

15  Finish asking the question.

16  BY MR. DENNER:

17  Q.    Had it reached a point where you were ready to take

18  your suspicions to a higher level?

19           MS. WEST:  Objection.

20           THE COURT:  Sustained.

21  BY MR. DENNER:

22  Q.    Did you arrest him because he was on the plane?

23           MS. WEST:  Objection.

24  BY MR. DENNER:

25  Q.    Getting on the plane?

1          THE COURT:  Sustained.

2   BY MR. DENNER:

3   Q.   Was there any legal prohibition that you know that

4   existed from him going to Egypt?

5   A.   No.

6   Q.   His wife had gone a couple of months ago, correct?

7   A.   Correct.

8   Q.   She went, she came back a month ago.  Anything in the

9   law that suggests to you he's not allowed to travel

10  anywhere he wants to?

11  A.   No.

12  Q.   Are you aware of any agents that were telling him

13  that he may not leave the continental United States for

14  any reason whatsoever?

15  A.   No.

16  Q.   Do you have any real reason to believe that he was

17  going over there for anything other than a legitimate

18  business purpose?

19          MS. WEST:  Objection.

20          THE COURT:  Sustained.

21  BY MR. DENNER:

22  Q.   Do you have any reason to believe, do you know why he

23  was going over there?

24  A.   Other than what he said to Agent Nelson in the car

25  that is all I know.

1   Q.   Now that's that he wanted to die in Egypt?

2   A.   And see his sick sister.

3   Q.   I see.  And see his sick sister.  Do you have any

4   information from any law enforcement source whatsoever

5   that he was fleeing the country?

6        MS. WEST:  Objection.  It goes to the

7   investigation.

8        MR. DENNER:  Your Honor, respectfully, if

9   they're going to be claiming that he should be detained

10  because he was going to avoid prosecution by fleeing--

11       THE COURT:  Why can't he ask him if he has

12  evidence that he was fleeing as distinct from, we all know

13  he was getting on a plane, he had a ticket, right, both of

14  you are aware of that, but to the extent he has evidence

15  that he was fleeing, why isn't that--

16       MS. WEST:  Well I guess it would be, but I

17  suspect I would have presented that evidence if it were

18  the case.  I object to the questions about the general

19  investigation.

20       MR. DENNER:  I'm not talking about a general--

21       THE COURT:  Right.  But that's not the general

22  investigation.  That's just do you have – I'll overrule

23  the objection to the question.  If you have evidence that

24  he was fleeing, what, if any – I think that's what he's

25  asking you, right?

1        MR. DENNER:  Yes.

2  BY MR. DENNER:

3  Q.  Do you have any evidence that he was fleeing, not

4  just getting on a plane to go over there and do business?

5        THE COURT:  Beyond what you've testified to

6  already.

7  A  I was going to say the reason we're here is because of

8  what I've testified to but, no, I do not have anything

9  further.

10  BY MR. DENNER:

11  Q.  Okay.  Do you know if anyone else that you work with

12  that would have been part of this investigation had any

13  evidence that he was fleeing this country?

14  A.  No.

15  Q.  You don't know or the answer is no?

16  A.  My answer was no.

17  Q.  You talked about the different cars that he has.  Do

18  you think that makes him depressed?

19        MS. WEST:  Objection.

20        THE COURT:  Sustained.

21        MR. DENNER:  Okay.

22  BY MR. DENNER:

23  Q.  What do you think the significance of the cars are?

24  A.  It just lends itself to the lifestyle that he leads.

25  Q.  I see.  And is there something illegal about that

1  lifestyle?

2  A.   No.

3  Q.   Does that make him less likely to show up at trial?

4  A.   No.

5  Q.   Does owning houses make him less likely to show up at

6  trial?

7  A.   No.

8  Q.   Does it in fact make him more likely to show up at

9  trial?

10         THE COURT:  That's argument, Mr. Denner.

11         MR. DENNER:  May I have one moment, Your Honor?

12         THE COURT:  You may.

13     PAUSE

14  BY MR. DENNER:

15  Q.   Is he on suicide watch down at Wyatt where he's being

16  held right now?

17  A.   I do not know suicide watch.  We have definitely

18  alerted them to the statement that he stated in the car

19  about hurting himself.

20  Q.   And do you have any reason to believe that they put

21  him on any special kind of conditions of monitoring?

22  A.   I do not know.

23  Q.   Well did you check into that?

24  A.   I did, I personally did not.

25  Q.   Do you know if anyone has?

1  A.   Again, I do not.

2      PAUSE

3          MR. DENNER:  I have no further questions, sir.

4          THE COURT:  Any redirect?

5          MS. WEST:  Just two questions.

6                    REDIRECT EXAMINATION

7  BY MS. WEST:

8  Q.   Mr. Denner asked you whether, about his wife's work

9  and what she did and whether you knew how much she had

10 made, you said yes.

11         How much does she make?

12 A.   I do not recall the exact figure.  We went over it

13 this afternoon.

14 Q.   Can you give us a ballpark?

15         MR. DENNER:  Objection, Your Honor.  If he wants

16 to refresh his memory with some notes or some other things

17 certainly, but I would object to a ballpark.

18         THE COURT:  You can testify if you, without

19 speculating.  You have a reasonable idea of what it was.

20 If you can't then--

21         THE WITNESS:  No.

22         THE COURT:  --you can refresh your recollection

23 with looking at something.

24         MS. WEST:  Thank you, Your Honor, I'm going to

25 move on.

1  BY MS. WEST:

2  Q.   You were also asked a question in regard to the

3  timing of the wires and you said, in regard to that you

4  said it began in February 2009.

5       Just for clarification did the wires begin in

6  February of 2009 or did the investigation of the wires

7  begin in February of 2009?

8  A.   Our records go back to February of 2009.

9       THE COURT:  Your records of wires?

10      THE WITNESS:  That we have possession of--

11      THE COURT:  Yes.

12      THE WITNESS:  --currently, yes.

13      MS. WEST:  Your Honor, just briefly if I may.

14      PAUSE

15  BY MS. WEST:

16  Q.   I'm just going to show you some paperwork regarding

17  the issue of the wife's salary to see if it helps you--

18  A.   Sure.

19  Q.   --refresh your recollection.  Just take a look at

20  that.  There are three pages there.

21  A.   Okay.

22  Q.   Can you tell us is the wife's company an S

23  Corporation?

24  A.   Yes.

25  Q.   And as regarding the S Corporation how much money did

1  it claim as business income in 2012?

2  A.    $150,000.

3  Q.    And then in addition is the wife an actual employee

4  of the S Corporation?

5  A.    She is.

6  Q.    And as regard to wages for her in 2012 how much did

7  she claim?

8  A.    $64,000 net.

9         MS. WEST:  Thank you.  That's it, Your Honor.

10                   RECROSS EXAMINATION

11 BY MR. DENNER:

12 Q.    Do you know, that's for 2012 when everything as kind

13 of falling down around the Mashali's, correct?

14 A.    2013 was our search warrant.

15 Q.    Yeah, I agree, but your investigation had started

16 before that, right?

17 A.    Our investigation began in July of 2012.

18 Q.    Okay.  Now with regard to her income in 2011 or 2002

19 through 2011, do you have similar documents that would

20 suggest to you what she was making all through those

21 years?

22 A.    I personally do not.  We're working with IRS.

23 Q.    I see.  Okay.  Have you reviewed those documents?

24 A.    I have not reviewed those, no.

25 Q.    So you don't know if she was making a million dollars

1  a year during every year then or $10 a year, correct?

2  A.   Correct.

3         MR. DENNER:  Okay.  No further questions, sir.

4         THE COURT:  All right.  Thank you very much,

5  Special Agent.  You can step down.

6     WITNESS EXCUSED

7         THE COURT:  Any other evidence, Ms. West?

8         MS. WEST:  No, Your Honor.

9         THE COURT:  All right.  Mr. Denner, any

10  evidence?

11         MR. DENNER:  Sir, we are relying on the proffer

12  we have made which I hope Your Honor has an opportunity to

13  have read.

14         THE COURT:  I do.  I have.

15         MR. DENNER:  We electronically filed it.  We

16  also have a copy with that additional packet that I would

17  like to proffer if and when it becomes reasonable for you

18  to take a look at what we're talking about.  Your Honor,--

19         THE COURT:  What's the additional packet?

20         MR. DENNER:  The additional packet is, we are

21  suggesting that apart from many other conditions that are

22  mentioned in the document in our proposal to the Court

23  that the residence at 153 Pine Street, the marital

24  residence which has an equity value at this point based

25  on, we don't actually have an appraisal but we have the,

1   in our proffer in the part you don't have we have a tax,

2   the most recent--

3         THE COURT:  Tax assessment.

4         MR. DENNERR:  --tax value from the city and it

5   has about 3.5 something, almost $3.6 million value and a

6   mortgage of about $1.8 million.  So there's literally

7   about a, you know, about $1.8 million equity in that.  We

8   are suggesting that in addition to the 10 other issues, 10

9   other factors that we consider important in proposals,

10  conditions we're making to you that he also--

11        THE COURT:  Why did pretrial think it had

12  500,000 in equity?

13        PRETRIAL SERVICES:  Every answer that you have

14  in my report, Your Honor, is statements that the defendant

15  made to, to myself.

16        THE COURT:  I see.

17        MR. DENNER:  Well, Your Honor, I don't know

18  what, if it was a miscommunication or they were talking

19  about another house he has that they have, but it's fairly

20  clear there's at least a million eight equity in there.

21        THE COURT:  Okay.

22        MR. DENNER:  We have a title search for you as

23  well or title analysis done by a real estate attorney that

24  we have in there that suggests that there's about $1.8

25  million.  So we're suggesting given the nature of this

1 case and given the importance to us of his freedom both

2 on a personal level and a professional level to help us,

3 help assist us in this case which is going to be a very

4 labor intensive case as it goes forward, that he put up a

5 million dollars bail that would be essentially a bond

6 that's collateralized, a million dollar bond

7 collateralized by the $1.8 million equity in the Dover

8 house.  The Dover house is owned by a trust that Mrs.

9 Mashali, Mrs. Dr. Mashali is the in fact the sole trustee

10 and she is in a position to execute the quitclaim and the

11 escrow agreements and all the other stuff that we have in

12 our other packet for the--

13          THE COURT:  Does it require the consent of the

14 beneficiaries?

15          MR. DENNER:  I don't actually believe it does

16 but it would have the consent of the beneficiaries.  My

17 understanding - I think she actually speaks for the

18 beneficiaries cause the beneficiaries are the children

19 and--

20          THE COURT:  Yeah.

21          MR. DENNER:  --she would in fact be the--

22          THE COURT:  I think he'd be the guardian of the

23 children or she and the defendant.

24          MR. DENNER:  Yeah.  So the answer is to the

25 extent that it does, and I'm not a real estate whiz, you

1  would have that.  We're also suggesting, we're also

2  suggesting any other conditions that would make this Court

3  comfortable.  Now I think I'm overstating candidly the

4  amount of money and collateral that we're willing to put

5  up to convince this Court and persuade this Court that it

6  would be enough to essentially assure his presence here

7  cause I actually don't think that's necessary, but I think

8  it's a fairly significant if not dramatic expression on

9  their parts of how much faith she and the family have in

10 him that he would – if he were not, in addition if he were

11 not going to be here, if he were going to run away

12 somewhere, Your Honor, he wouldn't have hired myself and

13 my firm.  He wouldn't have fired Mr. Baron down in

14 Washington, D.C.  He wouldn't have already spent huge

15 amounts of money in relation to that.  He's hired--

16        THE COURT:  Is that how much you charge, huge

17 amounts of money?

18        MR. DENNER:  I do, I do.  I do.  At this point

19 in my life I have to.  With regard to – but fair.  With

20 regard, Your Honor--

21        THE COURT:  But fair.

22        MR. DENNER:  --with regard to civil things that

23 have come up, with regard to the Board of Registration

24 Medicine issues, we have been hired to handle that too and

25 we are going to be looking for re-hearings before the

1  Board of Registrations Medicine.  We are dealing with

2  all the record requests that are coming out.  I have three

3  or four civil lawyers including one that's sitting in

4  court today who's working around the clock on his civil

5  stuff.  This is not the profile of somebody who does not

6  expect to be here to at least do his very best to clear

7  his name and to move on with his life here.  His four

8  children are all in school here.  This is the only place

9  they know.  His wife has a very sophisticated and very

10  good dental practice that she's actually building on now

11  and bringing other doctors into it to make up for the lost

12  income.  This is not the--

13          THE COURT:  Where does she practice?

14          MR. DENNEER:  Excuse me?

15          THE COURT:  Where does she practice?

16          MR. DENNER:  She has a periodontal--

17          THE COURT:  I mean I've heard about that she has

18  this practice and $4:13:03

19          MR. DENNEER:  She has a periodontal practice,

20  where are her offices?

21          THE DEFENDANT:  In Winchester.

22          MR. DENNER:  In Winchester, Massachusetts.

23          THE COURT:  How long has she practiced there or

24  been in practice as a dentist in Massachusetts?

25          MR. DENNEER:  She's been in practice for 17

1  years in Massachusetts.  And she had willowed it down

2  when the pain clinics were doing very, very well and now

3  she's building it back up again.  The children are in

4  school here.  The children's friends are here.  He's an

5  honorable discharged United States Army veteran which I

6  take very seriously.  The notion that this case was

7  proceeding as it was proceeding, that he had lawyers hired

8  that we were doing our very, very best to deal with

9  contingencies; we were trying to get a civil situation

10  squared away.  We were trying to essentially understand

11  where the criminal case was coming from.  We were trying

12  to deal with, as you can see and perhaps the complaint and

13  affidavit in support of the complaint there's an awful lot

14  of very disgruntled people that have said a lot about him,

15  former employees.  I don't think he was the best employer,

16  and I don't think he makes a lot of friends, at least

17  friends in that area, however he does have friends.  You

18  see the letters in support of him.  There are a lot of

19  people who care--

20        THE COURT:  I haven't seen, you refer to them in

21  your filing but I haven't, was there a--

22        MR. DENNER:  Okay, I think they were attached to

23  the motion but if they're not--

24        THE COURT:  Oh, all right.  So maybe Maria

25  didn't print that out.  I'll look at those.

1    MR. DENNER:  But there's an awful lot of

2  people who think the world of him.  But again without

3  getting into, you know, platitudinous about, you know, the

4  American dream and what it means to a lot of Egyptians and

5  a lot of people from a lot of other countries that come

6  here and kind of breathe that air, he has put together,

7  perhaps imperfectly, but he and his wife have put together

8  a wonderful life here.  The notion that he got on an

9  airplane to fly to Egypt for the third in a period of time

10  and therefore, and he had too many pills and he had

11  pictures of his wife so therefore he wasn't coming back,

12  is pure conjecture.  I mean it's absolutely pure

13  conjecture and we can dress it up any way we want and we

14  can spin it, and if I were sitting there I would do the

15  same thing, but that doesn't make it true.  It simply

16  doesn't.

17    The vast majority of the money they have right

18  now is tied up in the Dover house.  Most of the other

19  houses they have are cross collateralized by a very large

20  loan and have very little equity in them.  He has a

21  partner in the Florida, but probably I'm guessing but it's

22  an intelligent guess that at least 80, 90% of the money

23  they have, any illiquid assets they have, they don't have

24  a lot of liquid assets, are tied up in there other than

25  the money they've sent to Egypt and they had been

1  investing in Egypt.  They have great contacts in Egypt.

2  They have great business opportunities in Egypt and they

3  sent the money over there.  And he went over to Egypt

4  because the money had dried up.  I, as an officer of the

5  court I will tell you that we've had a lot of

6  conversations about getting that money untied because that

7  was the source of the money we were getting paid, the

8  $7,000 a week that had been coming in, at least a good

9  deal of that.  And if you're counting Mr. Baron in

10  Washington there was a great need to be able to continue

11  to keep the kids in school and put the legal defenses

12  together.  And I candidly suggest to the Court that I

13  think it was a bad idea for him to get on that plane and

14  we didn't discuss it ahead of time in terms of doing that,

15  but if he was going over there it was not to somehow take

16  his pills and settle down there and die with his mother

17  right.  He is incredibly committed to his children,

18  incredibly committed to his family.  He may be depressed.

19  The depression that I've seen, that I've learned about

20  from his wife started basically when this investigation

21  started and this investigation--

22          THE COURT:  Okay.

23          MR. DENNER:  At any rate I don't think he's a

24  risk of flight.  I don't think there's any evidence that

25  rises to the level of preponderance of the evidence that

1  he was going to Egypt to flee.  I think the logic of the

2  situation given the incredible connections he has to this

3  country, to his wife, to his children who are Americans,

4  to the investments they have here, I think the conditions

5  that we're suggesting, that he give up his passport, that

6  – virtually anything that pretrial services feels is

7  appropriate punctuated by a million dollar bond,

8  collateralized by a million-eight in his Dover house, the

9  one asset they had left, that in fact is protected and

10 that basically comprises their life right now where, not

11 only their economic life and financial life but where

12 their children live and the continuity of everything

13 they've had before.  This was a man who was very

14 successful years ago and probably didn't deal with the

15 success very well, at least economically and financially,

16 and they made a lot of investments and a lot of them went

17 south.  They've got one left in Egypt that they're trying

18 to get their money back in to be able to defend this case.

19 There's nothing about that to suggest to me that he is a

20 flight risk.  I think quite the opposite, when you add up-

21 -

22        THE COURT:  Okay.  Thank you.

23        MR. DENNER:  All right.

24        THE COURT:  Ms. West, is the gist of your

25 argument, I don't want to cut you off but it's late in the

1    day and, that he was in a business that, there's the

2    suggestion that at least suggestion of the evidence that

3    an awful lot of money ran through that business and it was

4    fraud in the form of the fraud that's alleged in the

5    complaint.  That he's moved a lot of money overseas, $1.7

6    million I think was the testimony of the agent.

7        MS. WEST:  Right.

8        THE COURT:  That in the course of all this

9    there's at least the specter of bankruptcy fraud which I

10   take it you're arguing in terms of his then likelihood to

11   either honestly and faithfully comply with the conditions

12   of this Court if there is, unproven at this moment but at

13   least a specter that perhaps there was some sort of fraud

14   perpetrated on the bankruptcy court, and one of the

15   investments was a residential property in Egypt and,

16   therefore, there might be a place to live in Egypt and

17   money and business interests and therefore, plus a quickly

18   purchased ticket at a time when, after a long period of

19   time in which much of what Mr. Mashali was building had

20   unraveled and that therefore he might be a risk of flight

21   to go there to, if for anything else, to escape from it

22   all; is that the?

23       MS. WEST:  Indeed, Your Honor.  You summarize it

24   better than I could do but if I could only add three

25   points.

1          THE COURT:  Yes.

2          MS. WEST:  The first regard is the pretrial

3    probation report.  As you look through it it does seem

4    quite inadequate in terms of the financials and what the

5    defendant told Ms. Brown.  It's clear that that is not the

6    full financial--

7          THE COURT:  Picture.

8          MS. WEST:  --picture of the defendant.

9    Secondly, Mr. Denner brought up the, his last trip to

10   Cairo November 12th and nothing happened, he came back.

11   There's a very big difference between November 2012 and

12   now.  After November 2012 in April he received a subpoena

13   from Rhode Island Board of Medicine on the sixth deaths

14   that were associated with his practice.  In August the

15   report from the Rhode Island Board of Medicine came out

16   indicating that his treatment of them had been below par

17   and therefore they suspended his license.  He then

18   voluntarily suspended his Massachusetts license and he

19   voluntary gave him his DE registrations.  It was then that

20   we did the search warrants.  So the difference between his

21   trip to Cairo in November 2012 and his trip to Cairo right

22   now is very big.

23          The last thing I would be remiss to mention to

24   the Court is the only information as we know it as regard

25   to his mental health are his own statements, his

1 statements to the agent that he thought about suicide

2 every day.

3         I understand that when he went to Plymouth on

4 Monday that an evaluation should have taken place.  I

5 called the marshals.  I don't have the result of that

6 evaluation and I don't believe that Ms. Brown has

7 information on that.  So I'll say this Court has to take

8 it on its face.  If he is a suicide risk, I mean certainly

9 we would say that surely fleeing is a much better option

10 than committing suicide.  And secondly, suicide certainly

11 could not reasonably assure his appearance here.  And

12 those are the three things I wanted to mention.

13         THE COURT:  All right.  I'm going to, I'll say

14 just to both of you I'm going to take it under advisement

15 for a couple reasons.  One) I want to read the letters

16 that Mr. Denner submitted.  They're part of the record and

17 I need to read them before I make a decision and I haven't

18 had the chance to do that.  So I'm going to read those

19 letters.  I'm going to look over the pretrial services

20 report a little more carefully than I had the opportunity

21 to at the beginning of the hearing.  And I'll tell you I'm

22 going to take it under advisement.  I might have another

23 hearing I will tell you, but I'm not going to schedule

24 that at the moment cause I want to think about it.  If I

25 do have another hearing it will be promptly.  It won't be

1  in a long time and it'll probably be next week if I have

2  another hearing.

3         The questions I'll just tell you, the things I'm

4  thinking about in my mind, I'm not persuaded as Mr. Denner

5  suggested there's nothing, no risk of flight here at all.

6  On the other hand having satisfied myself at the moment

7  that I'm prepared to say that Mr. Mashali must be detained

8  to reasonably assure his appearance, I'm not saying I

9  wouldn't come to that conclusion but I just haven't

10  completely come to that conclusion yet, and I do think if

11  I were to release him, Mr. Denner, I'm not sure that I

12  would release him on the conditions you propose.  The

13  concern I'd have is given the amount of money in this

14  case, be it money he made lawfully and successfully years

15  ago or money that he acquired pursuant to the alleged

16  fraud or some combination of both, there's a lot of money

17  here, there's a lot of money overseas. And so while I

18  agree with you that the loss of the home is a very

19  significant thing both because it has a lot of equity in

20  it and it's the place that the children and the family

21  resides so it stands in a different way than all the other

22  assets that they might have or have had, nonetheless it's

23  still only to some degree money and I want to think about

24  what things this case poses and think about that so that

25  if I did have you back I could ask you both about it.

1         MR. DENNER: Your Honor, two quick things. We

2 would pledge whatever assets the Court felt was an

3 appropriate package to--

4         THE COURT: I understand you're willing to do

5 anything.

6         MR. DENNER: --reasonably assure the Court. The

7 second thing is, actually three things. Second thing is I

8 have this additional packet that has the title search or a

9 title analysis and a variety of other documents and I

10 would like--

11         THE COURT: Well I'll take it.

12         MR. DENNER: --to proffer that.

13         THE COURT: Sure.

14         MR. DENNER: And give one to my sister. The

15 third thing is that I am out of town on cases at least

16 until next Friday so--

17         THE COURT: All right. So if I have another

18 hearing it should be next Friday.

19         MR. DENNER: If it could be.

20         THE COURT: Yes. Fine. So if I have another

21 hearing it'll be next Friday or Monday the following week.

22 All right, so I'm going to take it under advisement. I'll

23 look at all this.

24         The defendant's remanded to the custody of the

25 United States Marshal Service. Anything else we have to

1   do?  No.            We're adjourned.  Thank you.

2            THE CLERK:  All rise.  This matter's adjourned.

3   (Court adjourned at 4:24:00 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

I, Maryann V. Young, court approved transcriber,

certify that the foregoing is a correct transcript from

the official digital sound recording of the proceedings in

the above-entitled matter.


/s/ Maryann V. Young          April 17, 2014